UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALERIE BRADLEY, an individual,

                Plaintiff,

   v.

XDM, Inc., f/k/a DIALOGUE
MARKETING, a Michigan
corporation,

                Defendant.

Case No. 15-14154
Hon. Terrence G. Berg

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DKT. 16)**

    Plaintiff Valerie Bradley brings this cause of action alleging that her former employer, Defendant XDM, Inc., discriminated against her based on her color, race and age, and also retaliated against her in contravention of the Michigan Elliot Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2101, and Title VII of the Civil Rights Act of 1964 (Title VII). 42 U.S.C. § 2000e-2. (Dkt. 1).[1]

    Before the Court is Defendant XDM Inc.'s (XDM) motion for summary judgment on Plaintiff's remaining claims against it for color, race, and age discrimination under the Michigan ELCRA, and unlawful retaliation under Title

---

[1] In an earlier, stipulated Order, this Court dismissed with prejudice Plaintiff's Title VII discrimination claim and barred Plaintiff from pursuing a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621, to the extent any such claim arose out of Equal Employment Opportunity Commission (EEOC) Charge of Discrimination number 471-2013-03016. (Dkt. 11).

VII. On January 18, 2016, the Court heard oral argument on Defendant's motion in Flint, Michigan.

For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED** as to both of Plaintiff's claims against it.

I.   Background

Plaintiff Valerie Bradley is an African-American female. At the time that XDM allegedly discriminated and unlawfully retaliated against her, she was approximately fifty years of age.[2] Plaintiff began working for XDM on or about October 15, 2012. The company operated a call center that served the telemarketing and support needs of its customers, such as Frito-Lay and PepsiCo. XDM assigned Plaintiff to its "Snacks 2 You program," which provided customer support services to agents of retail stores that purchased its customers' products and who could call XDM in regard to matters such as shipping and product information. Plaintiff was hired to work as a customer service representative; her job responsibilities included taking customer orders and responding to customer complaints over the phone.

On August 8, 2013, Plaintiff filed a Charge of Discrimination against XDM with the EEOC. (Dkt. 16, Ex. 13). On December 27, 2013, XDM terminated Plaintiff. (*Id.*, Ex. 24). The remaining claims in Plaintiff's complaint are that: (1)

---

[2] In Plaintiff's response to XDM's motion for summary judgment, filed with the Court on October 24, 2016, Plaintiff states that she is fifty-two years old. She alleges that the discrimination and retaliation she complains of occurred in 2013. The Court therefore infers that at the time of XDM's allegedly unlawful acts against her, she was approximately fifty years of age.

2

during the approximately fourteen months Plaintiff worked at XDM, she was denied opportunities for promotion or other incentives on the basis of her race, and (2) XDM supervisors severely or pervasively harassed her, or decided to terminate her, because she filed a discrimination charge. Plaintiff argues that because of her race, she was not told about certain opportunities for promotion and was denied favorable changes to her shift time and a request to train on an additional software program.[3] She further claims that as a result of her decision to file an EEOC Charge, she was harassed and terminated. XDM responds by asserting that Plaintiff was never denied opportunities for promotion, harassed, or prevented from obtaining favorable changes to her shift time or software training opportunities on the basis or her race or because of her EEOC complaint. Instead, XDM contends that Plaintiff was terminated because of her record of unprofessionalism and inability to improve her performance after receiving coaching.

*Plaintiff's Initial Work Performance Issues*

The evidentiary record indicates that Plaintiff was formally assessed negative feedback from her supervisors, customers, and colleagues, on the following occasions during the time period of February, 2013 through May, 2013:

- On February 21, 2013, Plaintiff's supervisor completed a written performance review for the first ninety days of Plaintiff's employment with XDM:[4] the review noted Plaintiff had an upbeat and patient attitude on the phone, and that she has an outgoing personality and tries to reach out to her colleagues, but that she also struggles with arriving on time and can be

---

[3] At oral argument, Plaintiff's counsel stated that Plaintiff voluntarily abandoned her claim for age discrimination.
[4] Plaintiff's supervisor at this time was Vanessa Boling, who is a white female.

3

abrupt. (Dkt. 16, Ex. 2). In the competency categories of "quality, customer focus, [and] team work," Ms. Boling rated Plaintiff as "meets requirements," and in the competency category of "attendance/punctuality" as "occasionally meets requirements." (*Id.*).

- On February 22, 2013 XDM issued Plaintiff a "mistreat/mishandle" form for taking an "argumentative/rude" tone with a customer, which is in contravention of XDM's Quality Assurance Manual. (*Id.*, Ex. 7 at Pg ID 331; Ex. 4 at Pg ID 203). In response to this, Plaintiff testified that she received one-on-one coaching from a supervisor on how to be patient during phone calls. (*Id.*, Ex. 2 at Pg ID 120).

- On February 25, 2013, two XDM employees logged formal complaints in the company's computer system stating that Plaintiff had been "kind of snotty" and "offensive" to them respectively. (*Id.*, Ex. 8 at Pg ID 333).

- On April 23, 2013, Plaintiff received a "corrective action form" stating that it was the "final notice" that XDM would be providing her regarding her late arrivals to work. (*Id.*, Ex. 9 at Pg ID 339-40). XDM has an attendance policy whereby employees are assigned points whenever they are late to work, and the later they arrive, the more points they are assigned. (*Id.*, Ex. 5 at Pg ID 318). According to the policy, when an employee accrues six points they will receive a written warning, and when an employee receives twelve points, they will be reviewed for termination. (*Id.*) The April 23, 2013 corrective action form stated that Plaintiff had accrued eleven and one quarter points, though Plaintiff testified that this amount was incorrect, and that her point total on account of lateness was eight and a half. (*Id.* Ex. 9 at Pg ID 339-40; Ex. 2 at Pg ID 121-22).

- On April 24, 2013, a supervisor advised Plaintiff against elevating her voice with customers and reprimanded her for "smacking [his] desk to grab [his] attention." (*Id.*, Ex. 8 at Pg ID 334).

- On May 22, 2013, a colleague logged a formal complaint stating that Plaintiff "got snappy" with her. (*Id.*).

- On May 29, 2013 Plaintiff received a corrective action form—*i.e.* a written warning—after, in reference to a customer whom Plaintiff mistakenly thought was on mute, she stated to her supervisor "this crazy lady wants to talk to you," such that the customer heard this comment. (*Id.*, Ex. 10 at Pg ID 342). The audio recording of this call is entered in the evidentiary record. (*Id.*, Ex. 11 at 4:38).

4

*Events Preceding Plaintiff's EEOC Charge*

Plaintiff testified that she verbally requested a change in shift time from the night shift to the day shift from Ms. Boling in "May or June [2013]," but that Ms. Boling denied her request, stating to her, "get in line, there are people with three and a half years seniority." (Dkt. 18, Ex. A at Pg IDs 469-70, 480). When XDM's lawyer asked Plaintiff at her deposition if it was her opinion that Boling denied her request based upon "her race and age," Plaintiff testified, "[t]hat played a part, yes." (*Id.* at Pg ID 478).[5] Plaintiff further stated that "in [her] department," switching from the night shift to the day shift was "considered a promotion." (*Id.* at Pg ID 480). As Defendant points out, XDM policy requires employees to submit a Schedule Change Form to change shift times. (Dkt. 16, Ex. 5 at App. A, 16). On July 5, 2013, Plaintiff completed a Schedule Change form, and it was signed by a supervisor, indicating that her shift would be permanently changed from 11:30 am – 8:00 pm to 10:30 am – 7:00 pm, effective July 15, 2013. (Dkt. 16, Ex. 25). Plaintiff testifies, however, that this shift change was not permanent, as it was "only for a specific date." (Dkt. 18, Ex. A at Pg ID 476). Moreover, Plaintiff testifies, two of her Caucasian colleagues, whom she identifies as "Keegan" and "Scott" were "promoted"—*i.e.* given permanent day shifts—even though they were hired after her. (*Id.* at Pg ID 479-80). Plaintiff's testimony conflicts, however, on whether Keegan and Scott were awarded shift changes when Ms. Boling—the alleged

---

[5] When asked "what else played a part?," Plaintiff replied, "[Ms. Boling's] interacting with the African-American and Hispanics versus the Caucasian that was just openly displayed…From speaking, walking past, speaking to Caucasians and looking us dead in our face and not speak [*sic*]." (*Id.*)

5

discriminatory supervisor—was at the company. It is undisputed that Ms. Boling left XDM on August 15, 2013. (*Id.* at Pg ID 550). At her deposition Plaintiff first testified that Keegan and Scott received "promotions" to the day shift in September, 2013; just a few moments later, however, she testified that Keegan and Scott changed shifts "by May, June [2013]." (*Id.* at Pg ID 479). At some point between mid-August, 2013 and mid-September, 2013, after Ms. Boling left XDM on August 15, 2013, Plaintiff testified that her shift was changed permanently to 8:30 am to 4:30 pm. (*Id.* at Pg ID 482).

In addition to her allegations that shift change decisions were made on the basis of race, Plaintiff testified that Ms. Boling "had [the employees] sitting segregated" and did not "post" any opportunities for promotions or incentives. (Dkt. 18, Ex. A at Pg ID 551). "You never knew what was available," Plaintiff testified, "until [Ms. Boling] brought [an opportunity for incentive or promotion] to whoever she wanted to." (*Id.* at 552). Plaintiff added that she felt like Ms. Boling "favored Caucasians in this regard." (*Id.*; *Id.* at Pg ID 539-40). Plaintiff testified further that Ms. Boling denied her request to be trained on a software program that would have allowed her to work as a customer service representative for Pepsi Co. (at that time, she was trained only to work for Frito-Lay) (*Id.* at 579-80, 582-83). Plaintiff states that she saw Ms. Boling training two white colleagues—"Steven [who Plaintiff stated she mistakenly referred to as "Scott" earlier in her deposition] and Keegan"— and walked up to Ms. Boling to request that she be allowed to join the training session, but Ms. Boling said no. (*Id.*) Plaintiff acknowledged that she was trained on

6

Pepsi Co. "a couple months later," when XDM offered training for this product to their entire staff. (*Id.* at 582-83).

Although Plaintiff also testified to the facts that she applied and was turned down for two different promotions within the company on June 12 and June 17, 2013, (Dkt. 16, Ex. 12), as well as a position as a human resource assistant in or about July 31, which she does not characterize as a promotion, (Dkt. 18, Ex. A at Pg ID 468), Plaintiff maintained that she does not attribute any of these hiring decisions to discriminatory animus. (*Id.* at Pg IDs 467-69). Moreover, with respect to the first two positions, Plaintiff admits that she was ineligible for these promotions, because she received a written warning on May 29, 2013 and, according to XDM policy, could not receive a promotion until three months after receiving such a warning—that is, not until after August 29, 2013. (*Id.* at Pg ID 465; Dkt. 16, Ex. 5 at Pg ID 249).[6]

*Plaintiff's EEOC Charge and Events Subsequent*

On August 8, 2013, Plaintiff filed a Charge of Discrimination with the EEOC. (Dkt. 18, Ex. B). She testified that thereafter a Caucasian supervisor named John "grabbed my attention a couple days after I had filed that telling me about me filing this and that [Ms. Boling] was being terminated. She had seven days to go." (*Id.*,

---

[6] The fact that Plaintiff testifies that she was approved for a change to the day shift on August 15, 2013, see *supra* p. 5, suggests that XDM must not have considered such a shift change to be a promotion, because on August 15, 2013 Plaintiff was still ineligible to receive a promotion. Whether or not a shift change is a promotion bears on whether the denial of a shift change constitutes an "adverse employment action" against Plaintiff. *See infra* Part III.A.

7

Ex. A at Pg ID 481). Plaintiff testifies further that, when Ms. Boling left, she was supervised by Rhonda Baker, an African American. (*Id.* at Pg Id 490). In addition, Plaintiff testified that at some time, which she does not identify, she told Ms. Baker that she had previously filed an EEOC Charge, (*Id.* at Pg ID 554-55) and that thereafter Ms. Baker began taking away her job responsibilities and paying extra attention to Plaintiff's phone calls and attendance. (*Id.* at Pg ID 555-56).[7] On December 27, 2013, approximately four and a half months after Plaintiff filed her EEOC Charge, XDM terminated her. (*Id.* at Pg ID 538; Dkt. 16, Ex. 24).

*Plaintiff's Work Performance Issues after her EEOC Charge*

From August 8, 2013—the day Plaintiff filed her EEOC Charge—until December 27, 2013—the day XDM terminated Plaintiff—colleagues, customers, and supervisors logged the following complaints against her:

- On August 20, 2013 supervisor Melanie Brown submitted an internal report stating that Plaintiff had received a customer complaint for improperly processing an order, and that Plaintiff delivered a response to the customer that was "very rude." (Dkt. 16, Ex. 8 at Pg ID 336).

- On September 6, 2013 supervisors Larry Walker and Adam Holler met with Plaintiff to discuss her recent "outburst" after Mr. Walker emailed her around late August or early September regarding her violation of a quality assurance policy; Mr. Walker states that during this meeting he informed Plaintiff that "her unprofessionalism would not be tolerated." (Dkt. 16, Ex. 14 at Pg ID 362).

- Mr. Walker states further that on October 22, 2013 he provided Plaintiff with protocol for product-related service complaints and "perceived that she was

---

[7] Plaintiff testifies that in December 2013, XDM supervisors reviewed four of her customer calls, whereas the usual company policy is to review two calls of each employee per month. (*Id.* at Pg ID 538).

8

unreceptive to the training as she became combative during the training session." (*Id.*).

- On November 7, 2013 XDM issued Plaintiff a corrective action form, indicating that it was serving as final notice of her attendance problems. (*Id.*, Ex. 15). That same day, XDM granted her request to change shift time for a three-week period. (*Id.*, Ex. 16).

- Around November 23, 2013 XDM issued Plaintiff a mistreat/mishandle form for greeting a customer sixteen seconds into a call, whereas XDM's Quality Assurance Manual states that seven seconds of dead air is improper. (*Id.* at Ex. 17; Ex. 4).

- On December 2, 2013, Rhonda Baker issued Plaintiff a corrective action form noting the November 23, 2013 incident, as well as a November 26, 2013 incident, where Plaintiff received a formal complaint from a customer regarding unprofessionalism. (*Id.* at Ex. 20). In response to these incidents, Plaintiff testifies that her supervisors met with her and provided her with a "three, four-hour training." (Dkt. 18, Ex. A at Pg ID 499). On December 2, 2013, XDM also approved a shift change form that Plaintiff submitted. (Dkt. 16, Ex. 21).

- On December 23, 2013, Ms. Baker issued Plaintiff a final corrective action form, recommending Plaintiff's termination: the form indicated that on December 18, 2013, Plaintiff received a formal complaint from a customer stating that Plaintiff was unprofessional and provided misinformation. (Dkt. 16, Ex. 24 at Pg ID 382). The form states further that XDM reviewed one of Plaintiff's calls from December 23, 2013 and found that she exhibited similarly rude behavior and did not demonstrate a desire to assist the customer. (*Id.*). Finally, the form noted that Plaintiff "does not accept ownership of any of these actions and appears unreceptive to coaching." (*Id.*).

Ms. Baker states in an affidavit that she "decided to terminate Valerie Bradley [*sic*] employment because [she] failed to: (1) perform her job responsibilities in conformance with Dialogue Marketing's Expectations; and (2) rectify her performance problems despite receiving additional training." (Dkt. 16, Ex. 3 at Pg ID 179).

## II. Summary Judgment

Summary judgment is proper where the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must point to evidence supporting its position that is "significantly probative" and more than "merely colorable." *Liberty Lobby*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a motion for summary judgment. *Id.* at 252. In deciding whether a reasonable jury could return a verdict for the nonmoving party, the Court must view the evidence, and draw all reasonable inferences, in that party's favor. *Id.* at 255.

## III. Discussion

### A. Plaintiff's Michigan ELCRA Claim for Race Discrimination

Plaintiff claims that XDM discriminated against her on the basis of race in violation of the Michigan Elliot Larsen Civil Rights Act (Michigan ELCRA). M.C.L. § 37.2202(1)(a). In pertinent part, the Michigan ELCRA provides:

10

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against any individual with respect to employment compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight or marital status.

*Id.* In deciding Michigan state law claims, the Court applies the substantive law from that state. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

A plaintiff can defeat a defendant's motion for summary judgment on a race discrimination case under the Michigan ELCRA by producing direct or circumstantial evidence of racial bias. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462 (2001). Because Plaintiff does not offer direct evidence that XDM discriminated against her on the basis of race, the Court will analyze her claim under the legal framework that Michigan courts apply when adjudicating a claim for race discrimination under the Michigan ELCRA based on circumstantial evidence—*i.e.* the *McDonnell Douglas* burden-shifting framework.[8] *Id.*

Under *McDonnell Douglas*, a plaintiff first must establish a prima facie case of discrimination by presenting evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was otherwise qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. *Id.* at 463 (citing *Lytle v. Malday*, 458 Mich. 153 (1998). If the plaintiff sufficiently establishes these elements, a rebuttable presumption of discrimination arises, and the burden shifts to the

---

[8] In her response to XDM's motion for summary judgment, Plaintiff also structures her argument using the *McDonnell Douglas* framework. (Dkt. 18 at Pg ID 400-01).

defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *Id.* at 463-65. If a defendant successfully articulates such a reason, in order to survive a motion for summary judgment, the plaintiff must then present evidence creating a genuine issue of material fact as to whether the defendant's proffered reason for the employment decision in question was a pretext for discrimination. *Id.* at 465-66.

On this record, Plaintiff fails to proffer sufficient evidence to establish a prima facie case of race discrimination against XDM, and even if she did, XDM has articulated legitimate, nondiscriminatory reasons for each of the actions it took.  In response, Plaintiff does not demonstrate how any of these reasons were pretext for unlawful discrimination.

In analyzing Plaintiff's potential prima facie case, it is undisputed that as an African American female, she is a member of a protected class. With respect to the second element, Plaintiff argues that she suffered adverse employment actions when Ms. Boling refused to post opportunities for promotion or other incentives openly, denied her request to be trained on a software program for Pepsi Co., and refused to change Plaintiff's shift time to the day shift, which Plaintiff considered a promotion.[9] Adverse employment actions are "akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other

---

[9] Plaintiff does not contend that she was denied any of the three jobs she applied for based on discriminatory animus, nor does she contend that she was terminated on the basis of discriminatory animus. *See supra* pp. 5-6.  None of these employment decisions, therefore, are relevant to her claim of race discrimination against XDM.

12

indices that might be unique to a particular situation. *Chen v. Wayne State Univ.*, 284 Mich. App. 172, 202, (2009) (quoting *Meyer v. Center Line*, 242 Mich.App. 560, 569 (2000). Additionally, there must be an "objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling." *Id.* (citing *Wilcoxon v. Minnesota Mining & Mfg. Co.,* 235 Mich.App. 347, 363 (1999). On the available record, a reasonable jury could conclude that Ms. Boling subjected Plaintiff to an adverse employment action when she arbitrarily declined to inform Plaintiff of opportunities for promotion or other incentives within XDM. By contrast, the evidence does not raise a genuine issue of fact on the question of whether being denied a shift change is an adverse employment action because there is no objective evidence, aside from Plaintiff's subjective feeling, that such an action amounted to a promotion (and the fact that XDM approved a shift change for Plaintiff during the time period when she was ineligible to receive a promotion is evidence that XDM did not consider such a change to be a promotion. *See supra* note 4).[10] Likewise, no reasonable jury could conclude that Plaintiff suffered an adverse employment action when Ms. Boling denied her verbal request

---

[10] Moreover, the evidentiary record indicates that Plaintiff actually received a permanent shift change to an earlier shift on July 15, 2013, although she testifies that this shift change was only temporary. In addition, even if Plaintiff could prove that being denied a shift change constituted a promotion, and thus an adverse employment action, she does not present evidence sufficient for a reasonable jury to conclude that a change to the day shift was awarded to other actors on a discriminatory basis: she does initially claim that two white males, "Keegan and Scott," were awarded the day shift, but she is inconsistent on the question of whether this decision was made when Ms. Boling—the alleged discriminatory actor—was still working at XDM or at a later time. *See supra* page 4. Based on this evidence, the facts are insufficient to raise a genuine issue as to whether the shift change was actually denied, whether if denied such a denial was an adverse employment action, or whether if it was an adverse employment action, it was motivated by discrimination.

13

to be trained on Pepsi Co. software. Plaintiff presents no evidence that being approved to attend a training for a new product line was considered to be a type of promotion. And even if attending such training was tantamount to a promotion, Plaintiff admits that she eventually was approved for and received this training a couple of months after making her verbal request to Ms. Boling. The record therefore shows Plaintiff was not denied this opportunity.

Although a supervisor's arbitrary decision not to inform an employee of promotional opportunities would reasonably be considered an adverse employment action, the record does not raise a genuine issue of fact as to whether, in this case, Plaintiff was otherwise qualified for these promotions, or that these jobs were given to other employees under circumstances giving rise to an inference of unlawful discrimination. Plaintiff has presented no evidence indicating what promotions were allegedly available at XDM or how she would have been qualified for any of them. In contrast, XDM has presented a substantial amount of evidence indicating that Plaintiff repeatedly failed to comply with company policy in the areas of customer service, collegiality, and punctuality. Moreover, the only evidence Plaintiff provides that Ms. Boling offered these opportunities to other individuals on the basis of their race, is Plaintiff's testimony to her personal impression that Ms. Boling "favored Caucasians" with respect to these promotional opportunities. This testimony, without more, fails to cross the threshold of more than a scintilla of evidence that the summary judgment standard demands.

Because Plaintiff cannot produce sufficient evidence that Ms. Boling, or anyone else at XDM, denied her opportunities for promotion (or took any other adverse employment action against her) on the basis of her race, or that these opportunities were given to another person under circumstances giving rise to an inference of unlawful discrimination, Plaintiff fails to meet her burden of establishing a prima facie case of race discrimination against XDM, and her claim for race discrimination against the company under the Michigan ELCRA must fail. Accordingly, XDM's motion for summary judgment on Plaintiff's ELCRA claim against it is GRANTED.

### B. Plaintiff's Title VII Claim for Unlawful Retaliation

Plaintiff also brings an anti-retaliation claim against XDM under Title VII of the Civil Rights Act of 1964. Title VII, in relevant part, provides, "It shall be unlawful employment practice for an employer to discriminate against any of his employees…because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). As is the case for claims brought under the Michigan ELCRA, a Title VII retaliation claim may be brought by presenting direct evidence or circumstantial evidence, and where a plaintiff presents circumstantial evidence to demonstrate unlawful retaliation, a Court must examine the claim using the *McDonnell Douglas* burden-shifting framework. *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 673-75. Here, Plaintiff presents circumstantial evidence of unlawful retaliation: she argues that the facts

that Rhonda Baker and other XDM supervisors paid increased attention to her calls, and decided to terminate her four months after she filed an EEOC Charge demonstrates retaliatory intent.

To establish a prima facie case of retaliation, Plaintiff must present evidence demonstrating that (1) she engaged in activity protected under Title VII (2) her exercise of her protected rights was known to at least one supervisor at XDM, (3) an adverse employment action was subsequently taken against her or she was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Id.* (citing *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624. 639 (6th Cir. 2009)).

Plaintiff successfully meets the first two elements of a prima facie claim for unlawful retaliation: it is undisputed that her decision to file an EEOC Charge is a protected activity under Title VII, and she testifies that XDM knew of this charge because she told Ms. Baker that she had filed it. The third element requires either a showing of an adverse employment action, or of being subjected to a "severe or pervasive retaliatory harassment" by a supervisor. Plaintiff argues that XDM's decision to listen to four of her customer calls in the month of December constitutes retaliatory harassment because, normally, XDM only listens to two calls per employee per month. Although this evidence may show that Plaintiff's conduct was subject to more than the usual amount of scrutiny, there is no evidence that listening to two additional calls constitutes "severe or pervasive" harassment. Here,

the record shows that Plaintiff received two recent customer complaints during this period and the company's Quality Insurance Manual states that it is company policy to use "increasingly severe steps or measures" in response to an employee's underperformance. (Dkt. 16, Ex. 5 at Pg ID 248). Under such circumstances, subjecting Plaintiff's calls to some additional monitoring does not raise an issue that "severe and pervasive harassment" was occurring.

The third element of a prima facie case can also be met by a showing of an adverse employment action, and Plaintiff establishes this element because termination is clearly an adverse employment action. Plaintiff does not, however, present evidence sufficient to satisfy the fourth element: that is, to demonstrate a causal connection between her filing of an EEOC charge and XDM's decision to terminate her. Plaintiff contends that the following evidence demonstrates the causal connection between her EEOC charge and her termination: (1) she was "terminated within four months of making the EEOC Charge for performance issues that, based on XDM's response previously, barely warranted a written warning," and (2) her "job performance was generally good, but for a few missteps that were addressed through one-on-one coaching and additional training." (Dkt. 18 at 19). But Plaintiff's assertions regarding her job performance are unsupported by the evidentiary record: the corrective action form recommending Plaintiff's termination indicates that she was terminated for her unprofessional attitude and for a lack of receptivity to coaching—*i.e.* the performance issues that, in addition to her tardiness, various XDM supervisors noted about Plaintiff throughout the

17

duration of her employment with the company. Plaintiff's remaining argument for causality is temporal proximity, that she was terminated four months after she filed her EEOC Charge. Given the significant length of time between the EEOC charge and Plaintiff's termination, and the weight of the evidence of Plaintiff's additional performance problems that occurred in the interim, no reasonable jury could conclude, on this basis alone, that there exists a causal connection between Plaintiff's decision to file a discrimination charge and XDM's decision to terminate her. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality") (citing *Cooper v. City of N. Olmstead,* 795 F.2d 1265, 12727 (6th Cir. 1986) (holding that the mere fact that Plaintiff was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation).

Because Plaintiff cannot present evidence upon which a reasonable jury could conclude that there was a causal connection between her filing of the August 8, 2013 EEOC Charge and XDM's decision to terminate her employment, her claim for

18

unlawful retaliation in contravention of Title VII against XDM must fail.[11] Accordingly, XDM's motion for summary judgment on Plaintiff's retaliation claim against it is GRANTED.

### III. Conclusion

For the reasons stated above, XDM's motion for summary judgment is **GRANTED**.

**SO ORDERED**.

Dated:  February 3, 2017           s/Terrence G. Berg
                                                       TERRENCE G. BERG
                                                       UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically submitted on February 3, 2017, using the CM/ECF system, which will send notification to all parties.

                                                       s/A. Chubb
                                                       Case Manager

---

[11] Moreover, even if Plaintiff did proffer evidence sufficient to establish a prima facie case of unlawful retaliation against XDM, she still would not be able to meet her burdens under the *McDonnell Douglass* framework: XDM has demonstrated that, based on Plaintiff's documented, repeated failure to comply with company expectations, they had legitimate, non-discriminatory reasons to increase the frequency with which they monitored her calls and to terminate her employment, and Plaintiff has offered no evidence indicating that these actions were mere pretext for discrimination.